AO 106 (Rev. 04/10) Application for a Search Warrant

FILED

# UNITED STATES DISTRICT COURT
for the
Eastern District of Missouri

SEP 25 2019
U.S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

In the Matter of the Search of )
A black Samsung cellular telephone. This item is being securely stored at ) 
the Federal Bureau of Investigation, St. Louis Division, within the ) Case No. 4:19 MJ 6315 PLC
Evidence Control Room marked as Item "1B1" and attached with )
barcode labeled E6384804, 2222 Market Street, St. Louis, MO 63103. )
)

## APPLICATION FOR A SEARCH WARRANT

I, _____David Rapp_____, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT A

located in the ____EASTERN____ District of ____MISSOURI____, there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC 1591(a) and 2; 1952; 2423 | Sex trafficking by force, fraud or coercion, and aiding and abetting in the commission of the offense; Use of interstate facilities to promote, manage or facilitate prostitution; Transportation of a minor across state lines to engage in criminal sexual activity |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED HEREIN BY REFERENCE

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

David Rapp, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: September 25, 2019

*Judge's signature*

City and state: St. Louis, MO      Honorable Patricia L. Cohen, U.S. Magistrate Judge
*Printed name and title*

AUSA: Colleen C. Lang

IN THE MATTER OF THE SEARCH OF:

A black Samsung cellular telephone. This item
is being securely stored at the Federal Bureau of
Investigation, St. Louis Division, within the
Evidence Control Room marked as Item "1B1"
and attached with barcode labeled E6384804,
2222 Market Street, St. Louis, MO 63103.

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, David Rapp, being duly sworn, do hereby depose and state:

## INTRODUCTION

1. I am a Special Agent with the Federal Bureau of Investigation's (hereinafter referred to as "FBI") Violent Crimes Against Children Task Force. I have been a Special Agent for over 18 years. I have worked a variety of investigations to include prostitution, sex trafficking, sex trafficking of a child, possession of child pornography and production of child pornography. During my time as case agent on numerous complex investigations, I utilized a variety of investigative techniques to include: organizing and participating in physical surveillance; participating in undercover operations; serving search warrants; making arrests; and interviews involving defendants. As part of my duties as a Special Agent with the FBI, I investigate crimes involving sex trafficking and child pornography, including violations of Title 18, United States Code, Section 1591 (sex trafficking by force, fraud, or coercion); Title 18, United States Code, Sections 2422(a) and 2422(b) (coercion and enticement to engage in prostitution); Title 18, United States Code, Sections 2251(a) and 2251(e) (production and attempted production of child pornography). I have received specialized training in the area of sex trafficking, and have participated in investigations of persons suspected of violating federal sex trafficking laws, including Title 18, United States Code, Sections 1591, 1952, 2422(a), 2422(b).

2. This affidavit is made in support of an application for a search warrant to search for and seize instrumentalities, fruits, and evidence of a violation of Title 18, United States Code §§1591(a) (sex trafficking by force, fraud or coercion, and aiding and abetting in the commission of the offense); §1952 (use of interstate facilities to promote, manage or facilitate prostitution) and § 2423 (Transportation of a Minor Across State Lines to engage in criminal sexual activity). The evidence of these violations will be found in the following item that is the subject of the search and seizure applied for in this affidavit are more specifically described in Attachment A.

1

3.  This affidavit is made in support of an application for a search warrant to search a black, Samsung, cellular telephone, hereinafter "**Cell Phone A**", which was in the possession of minor victim "AK" (juvenile/protect identity), hereinafter referred to as "AK", and which had been provided to her by CAMERAN DUDLEY to facilitate sexual trafficking activities. **Cell Phone A** is being securely stored at the Federal Bureau of Investigation, St. Louis Division, Evidence Control Room, located at 2222 Market Street, St. Louis, Missouri, 63103.

4.  The information in this affidavit is based on my personal knowledge, information provided to me by other law enforcement officers and other persons, specifically the National Center For Missing and Exploited Children, other FBI Special Agents, the St. Louis Metropolitan Police Department, the Missouri State Highway Patrol and the St. Louis County Police Department. The information in this affidavit is submitted for the limited purpose of establishing probable cause in connection with the present application and is not intended as a complete statement of all facts related to the present investigation.

## DEFINITIONS

5.  The following terms have the indicated meaning in this affidavit:

    a.  The phrase "records, documents, and materials" as used herein, including those used to facilitate communications, includes all of the listed items of evidence in whatever form and by whatever means such records, documents, or materials may have been created or stored. Those forms and means of storage and creation include but are not limited to any handmade from (such as writing or marking with any implement on any surface, directly or indirectly); any photographic form (such as microfilm, microfiche, prints, slides, negative, videotapes, motion pictures, photocopies); or any information on an electronic or magnetic storage device (such as floppy diskettes, hard disks, and CD-ROMS), as well as printouts or readouts from any magnetic storage device.

    b.  "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates as a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software or digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

2

c.  The terms "records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, painting), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks (DVDs), Personal Digital Assistants (PDAs), Multi Media Cards (MMCs), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device) Cellular telephones or any other mobile device.

d.  Electronic data may be more fully described as any information stored in the form of electronic, magnetic, optical, or other coding on computer media or on media capable of being read by a computer or computer-related equipment.

e.  "Wireless telephone or mobile telephone, or cellular telephone'" as used herein means is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

f.  Sexually explicit conduct means actual or simulated sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; bestiality; masturbation; sadistic or masochistic abuse; or lascivious exhibition of the genitals or pubic area of any person. 18 USC 2256(2).

g. Visual depiction includes undeveloped film and videotape, and data stored electronically which is capable of conversion into a visual image. 18 USC 2256(5).

h. "Cellular Telephone hardware," as used herein, consists of all equipment which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives, SIM cards, memory cards and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

i. "Cellular Telephone software," as used herein, is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

j. "Cellular Telephone-related documentation," as used herein, consists of written, recorded, printed, or electronically stored material, which explains or illustrates how to configure or use various hardware, software, or other related items.

## CONSIDERATIONS REGARDING DIGITAL EVIDENCE

6. Digital and electronic files may be important to criminal investigations in several ways. In some cases, the objects themselves may be contraband, evidence, instrumentalities, or fruits of crime. Further, the objects may be used as storage devices that contain contraband, evidence, instrumentalities, or fruits of crime in various forms of electronic data. Rule 41 of the Federal Rules of Criminal Procedure permits the government to search for and seize computer hardware, software, and electronic files that are evidence of crime, contraband, instrumentalities of crime, and/or fruits of crime.

7. As further described in Attachment A, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crime described on the warrant, but also forensic evidence that establishes how the devices were used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the devices.

## CELLULAR AND MOBILE PHONES

8. As used herein, a cellular telephone or mobile telephone is a handheld wireless device used primarily for voice communication through radio signals. These telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other cellular telephones or traditional "land line" telephones. A cellular telephone usually includes a "call log," which records the telephone number, date, and time of calls made to and from the phone.

9. In addition to enabling voice communications, typically, cellular telephones now offer a broad range of capabilities. These capabilities include, but are not limited to: receiving and storing voice mail messages, storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Cellular telephones may also include global positioning system ("GPS") technology for determining the location of the device.

10. An Samsung is a brand of handheld wireless electronic communications devices made by Samsung Inc. Samsung cellular phones generally enable users to send email, make and receive telephone calls, access the Internet, and organize appointments and contact information. Samsung phones can also send instant messages, take digital pictures or moving video, or store and play digital music or video files. Samsung phones may also contain GPS technology for determining the location of the device.

## SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS AND/OR CELLULAR PHONES

11. Searches and seizures of evidence from computers commonly require agents to download or copy information from the computers and their components, or seize most or all computer items (computer hardware, computer software, and computer related documentation) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

> a. Computer storage devices (like hard disks, diskettes, tapes, laser disks, magneto opticals, and others) can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he/she often stores it in random order and with deceptive file names. The latter requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This

5

sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site.

b.  Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. Moreover, the vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications. As such, it is difficult to know prior to a search which expert should analyze the system and its data. The search of a computer system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

## SEARCH METHODOLOGY TO BE EMPLOYED

12. The search procedure of electronic data contained in computer hardware, computer software, and/or memory storage devices may include the following techniques (NOTE: The following is a non-exclusive list, as other search procedures may be employed):

a.  Examination of all of the data contained in such computer hardware, computer software, and/or memory storage devices to view the data and determine whether that data falls within the items to be seized as listed in Attachment A;

b.  Searching for and attempting to recover any deleted, hidden, and/or encrypted data to determine whether that data falls within the list of items to be seized as listed in Attachment A (any data that is encrypted and/or unreadable will be returned when law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

c.  Surveying various file directories and the individual files they contain;

d.  Opening files in order to determine their contents;

e.  Scanning storage areas;

6

f.  Performing keyword searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are likely to appear in the evidence described in Attachment A; and/or

k.  Performing any other data analysis technique that may be necessary to locate and retrieve the evidence described in Attachment A.

l.  I am requesting permission to have the analysis of the data done in the ordinary course of business of the agency that is performing the forensic analysis.

m.  To obtain the data from the cell phone/mobile devices contained within this warrant utilizing a range of data analysis techniques. However, in some extreme cases, the cell phone may be damaged beyond repair, password locked or otherwise inoperable causing traditional data analysis techniques not to work. In these cases, you are granted permission to use an analysis technique referred to as "chip-off". "Chip-off" is a process where the BGA (Ball Grid Array or memory chip) is removed from the cell phone to allow the chip itself to be analyzed. This process renders the cell phone unusable, but preserves the actual content."

## COMMERCIAL SEX TRADE AND THE USE OF CELLULAR PHONES

13.  Through my training, experience, and consultation with other law enforcement officers, I have learned that:

a.  I have investigated matters involving a violation of Title 18, United States Code, §§ 1591 and 1952. I have been trained regarding the investigation of these types of crime in which computers and cellular phones are used as a means for receiving, transmitting, and communicating in efforts to exploit victims, as well as services related to human-trafficking, which would include prostitution and other coerced commercial sex services.

b.  The development of computers, digital cameras, cellular telephones and the Internet has changed the way in which individuals involved in human-trafficking/prostitution interact with each other. Computers and storage devices for electronic media, cameras and cellular phones serve various functions in connection with human-trafficking/prostitution. They include: (1) advertisement (e.g., via Craigslist.com or Backpage.com); (2) communication (via email, Internet social media, cellular telephone or text) and (3) storage (pictures/images, electronic communications stored on computers, digital cameras and cellular telephones).

c.  Human traffickers and "pimps" can now store information and photographs

7

related to their business enterprises on electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMS and DVDs as well as printouts or readouts from any magnetic storage device.

d.   Human traffickers and "pimps" can now transfer photographs directly to and from a computer. A device known as a modem permits a computer to connect to other computers through the use of telephone, cable, or wireless connection. Electronic contact can be made to millions of computers around the world. A "pimp" is a term typically used in reference to a man (sometimes a woman), who solicits customers for a prostitute or a brothel, usually in return for a share or all of the earnings that the prostitute makes.

e.   The computer's ability to store images (and other electronic data, i.e. emails and other forms of communication) in digital form makes the computer itself an ideal repository for human traffickers and individuals promoting prostitution. The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has grown tremendously within the last several years. These drives can store hundreds of thousands of pieces of information and images at a very high resolution.

f.   The Internet affords individuals interested in human-trafficking/prostitution several different venues for viewing advertisements and communicating relatively anonymously in search for services.

g.   Organizers (like pimps) of human-trafficking/prostitution also utilize online resources to send and receive communications via services offered by Internet portals such as Yahoo and Hotmail, among others, and social media networking websites like Instagram, Twitter and Tagged.com. The online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in a variety of formats. A user can set up an online storage account from any computer with access to the Internet. Evidence of such online storage of human-trafficking/prostitution can be found on the user's computer(s). Access to the services can also be done from a cellular telephone (i.e., smart phone, iPhone, etc.).

h.   As is the case with most digital technology, communications by way of computer or cellular telephone can be saved or stored on either device which is used for these purposes. Storing this information can be intentional, i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite websites such as "bookmarked" or "favorite" files. Digital information can also be retained unintentionally, such as traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or internet Service Provider client software, among others). In

8

addition to electronic communications, a computer (and cellular telephone) user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. A forensic examiner can often recover evidence that shows that a computer contains specific software; when the software was installed; logs regarding the usage of the software; and even some of the files which were uploaded or downloaded using the software. Such information may be maintained indefinitely until overwritten by other data.

i. Organizers (like pimps) of human-trafficking/prostitution also utilize multiple cellular phones and/or computer devices in order to (1) communicate with their commercial sex workers (prostitutes), (2) facilitate commercial sex dates, (3) to avoid detection by law enforcement and (4) to communicate with potential customers in the commercial sex trade.

j. Human traffickers and pimps use digital cameras, cell phone cameras, digital video recorders and related media to take pictures and videos of their prostitutes. I further know that this is done for several reasons. Pimps post video and photographs to the Internet as a means of advertising their prostitutes. I further know that pimps are "collectors" and will retain these images and video as souvenirs. Pimps also will manufacture pornographic or sexually explicit videos and photos to satisfy their prurient interest.

14. Based upon my training and experience, the training and experience of other investigators with whom I have communicated, and police reports I have reviewed, electronic communication devices (cell phones, PDAs, computers, etc.) are permanently possessed by individuals involved in the commercial sex trade much the same way a legitimate business will use tools of its trade whether or not the business has a particular item in inventory on a given date. These items are kept by individuals involved in the commercial sex trade whether or not they are involved in or arranging for a criminal act at any given moment. I believe that the seizure of such items will provide evidence of the events set forth in this affidavit and that such files can be found within electronic devices described in Attachment A despite any lapse of the time between the events described and the anticipated search pursuant to this warrant.

**BACKGROUND INVESTIGATION AND PROBABLE CAUSE**

15. On June 21, 2019, Cyber-Tip CT 50409760 from the National Center for Missing and Exploited Children (NCMEC) was sent out to law enforcement in reference to a missing 16 year-old juvenile AK. AK had been reported missing by the St. Louis Department of Family Services (DFS) after she had run away from a foster home on May 31, 2019. AK was also reported by

9

DFS to have a history of trading sexual acts for money from men at a local park near where she was living.

16. On July 13, 2019, AK and two adult women, ALEXUS DODSON and CAMERAN DUDLEY attempted to enter the gaming floor of the Lumiere Place Casino in downtown St. Louis. AK presented a Virginia Identification Card in the name of Annalisa Thompson, with a date of birth of ▮ 1983. CAMERAN DUDLEY presented an Indiana Identification Card in her name with the date of birth of ▮ 1993. ALEXUS DODSON presented an Indiana Identification Card in the name of her sister, TIANA DODSON, with a date of birth of ▮ 1997. The security staff did not believe AK to be the person depicted in the identification card and denied her entry.

17. AK and ALEXUS DODSON left the gaming floor and returned to their vehicle, a Hyundai Elantra, Indiana Temporary License Plate K536968. At that time, after being alerted by casino security, Missouri State Highway Patrol (MSHP) Troopers responded to the parking lot and took custody of AK and brought her to the gaming control office in the casino to interview her relative to her utilization of fake identification. ALEXUS DODSON was not detained and she departed the casino in the Hyundai Elantra. CAMERAN DUDLEY also departed the casino at some point and likely departed the casino in the same vehicle with ALEXUS DODSON.

18. MSHP Troopers interviewed AK and she admitted her true identity. Upon learning that AK was listed as missing in the Missouri Uniform Law Enforcement System (MULES) and National Crime Information Center (NCIC) as a missing juvenile, MSHP Troopers contacted the St. Louis Metropolitan Police Department (SLMPD). SLMPD Officers took custody of AK at that time and brought her to a DFS facility. AK was interviewed by SLMPD officers at that time and admitted to traveling with the other females, who she said were her aunts, advising that they went to Texas, Alabama and Tennessee. AK also told the SLMPD officers that her clothes and other possessions were at a Red Roof Inn, located in Florissant, Missouri.

19. AK was transferred back to the custody of the DFS following the interview. However on July 15, 2019, AK once again ran away from the DFS facility and was again placed into the NCIC system.

20. On July 22, 2019, as part of the investigation into the missing juvenile, your affiant went to the Red Roof Inn, located at 307 Dunn Road, Florissant, Missouri, in an attempt to locate records for room rentals under the names of TIANA DODSON, CAMERAN DUDLEY and ANNALISA THOMPSON. Your affiant was provided with several receipts in these names for hotel stays that had occurred in the last 2 months. Additionally, the clerk advised your affiant that there was currently a room being rented by TIANA DODSON and that it had been rented on

10

July 21, 2019 with an anticipated checkout date of July 23, 2019. A staff member advised that the room was being utilized by two females and that one could possibly be middle school aged.

21. Believing it possible that AK was staying in the rented room, your affiant and other law enforcement went to the room, but determined that the room was unoccupied. At that time, law enforcement officers conducted surveillance on the hotel room. Shortly thereafter a Chevrolet Malibu with Indiana Temporary License Plate K587006 was observed returning to the Red Roof Inn. Two females were spotted in the vehicle and one looked younger and possibly fit AK's description. Upon exiting the vehicle, law enforcement approached and identified the occupants as ALEXUS DODSON and DESIREE FLEMMING, both 20 years of age.

22. ALEXUS DODSON was interviewed in reference to AK. ALEXUS DODSON admitted to being a prostitute and that she traveled to St. Louis from Indianapolis the day before. ALEXUS DODSON admitted to utilizing her sister's Indiana Identification Card to rent hotel rooms and also provided agents with her Indiana Identification Card, with a date of birth of July 1, 1999. ALEXUS DODSON admitted to knowing AK and that she was with AK at the casino the night she was arrested. ALEXUS DODSON advised that she and CAMERAN DUDLEY initially met AK at a gas station near the Red Roof Inn a few days prior to the casino incident. AK asked if she could hang out with them and CAMERAN DUDLEY allowed her to do so. ALEXUS DODSON did not know AK's age at that time but believed her to be younger than what she had advised. ALEXUS DODSON also was more suspicious of AK's age after the casino incident as she and CAMERAN DUDLEY knew that she had been denied entry and detained as she was a juvenile. ALEXUS DODSON advised that she and AK did not get along and that CAMERAN DUDLEY is the one who associated with her as she tried to avoid AK. ALEXUS DODSON stated that while at the Red Roof Inn, all of the girls engaged in prostitution. ALEXUS DODSON knew of three occasions that AK had met with a "john" in the hotel room and that CAMERAN DUDLEY had coordinated these meets as she placed on-line ads for AK and utilized her phone to arrange these meetings as AK did not have a phone at that time.

23. ALEXUS DODSON was asked if she knew of AK's whereabouts and she advised that AK was currently with CAMERAN DUDLEY in Indianapolis. CAMERAN DUDLEY had picked up AK on July 13, 2019 at the DFS facility and had taken her back up to the Red Roof Inn. They all stayed there for another day or two and then they all returned to Indianapolis, Indiana where AK and CAMERAN DUDLEY stayed together, while ALEXUS DODSON went to her boyfriend's residence. A few days later, AK CAMERAN DUDLEY, TRINA DUDLEY and "DIAMOND" traveled to Chicago, Illinois. ALEXUS DUDLEY and DESIREE FLEMMING traveled to Chicago, Illinois as well but in a separate vehicle. They all conducted prostitution related activities in Chicago, Illinois for a few days. On July 21, 2019, ALEXUS

11

DODSON and DESIREE FLEMMING traveled to St. Louis, Missouri while AK, CAMERAN DUDLEY and the other girls traveled back to Indianapolis, Indiana. CAMERAN DUDLEY was going to drop off her sister and DIAMOND and then she and AK were going to travel to St. Louis, Missouri to meet up with ALEXUS DODSON at the Red Roof Inn.

24. ALEXUS DODSON agreed to help investigators attempt to recover AK and placed several text messages and calls to CAMERAN DUDLEY to determine her location and when she would arrive to St. Louis. ALEXUS DUDLEY also allowed investigators to review historical text messages between her and CAMERAN DUDLEY on her cellular telephone and these text messages revealed that CAMERAN DUDLEY knew that AK was 16 years old and that AK was "working" for her.

25. While working with ALEXUS DODSON it came to your affiant's attention that DESIREE FLEMMING was sending text messages to unknown recipients back in the Indianapolis, Indiana area advising of law enforcement activities and telling people to advise CAMERAN DUDLEY to stop talking with ALEXUS DODSON as she was working with the police. At this time, CAMERAN DUDLEY sent ALEXUS DODSON screen shots of these texts from DESIREE FLEMMING, advised that she knew that ALEXUS DODSON was cooperating with police and stopped answering texts or calls at that time. It is also believed that CAMERAN DUDLEY got rid of her phone at that time as it was not with her when she was apprehended later that evening in Indiana.

26. ALEXUS DODSON signed a Consent to Search form allowing investigators to view her cellular telephone. Upon review, writer discovered the following text message exchange between ALEXUS DODSON and CAMERAN DUDLEY which occurred a few days prior July 22, 2019:

CD: India got a phone
AD: When she get one ? & girllll I hate lookin like that. She got an iPhone or no ?
CD: No she ain't earned tat I got her a plan wit metro with the free phone
AD: Awww well lmao
CD: She need to help text her plays. That's really why I hurried up and got it
AD: Yea of course look now she talk

Based upon this message string, it is apparent to the affiant that CAMERAN DUDLEY purchased a phone for AK to conduct prostitution related activities. ALEXUS DODSON advised when interviewed that prior to AK getting this phone that CAMERAN DUDLEY had placed online ads for AK utilizing her own phone on website that included but were not limited to TextFree and TextNow. It is also apparent that CAMERAN DUDLEY would receive profits

12

from AK's prostitution related activities as she states that "No she ain't earned tat", when refereeing to the type of phone she bought for AK.

27. Your affiant, in conjunction with agents from the Federal Bureau of Investigation Indianapolis Division, were able to locate AK later that same evening in the same Hyundai Elantra that had been observed at the Lumiere Place casino earlier in the month in Indianapolis, Indiana. CAMERAN DUDLEY was also in the vehicle and at that time was arrested on outstanding local warrants.

28. Upon locating AK, she was in possession of **Cell Phone A**. It was determined at that time that CAMERAN DUDLEY had recently purchased **Cell Phone A** and had given it to AK in furtherance of her sexual trafficking activities. **Cell Phone A** was placed into evidence at the Federal Bureau of Investigation Indianapolis Field Office and was then transferred to the Federal Bureau of Investigation St Louis Division, where it remains as of now.

## CONCLUSION

29. In view of the foregoing, there is probable cause to conclude that, in the digital media to be searched (**Cell Phone A**) there will be located evidence of a crime, contraband, the fruit or instrumentalities of a crime, of one or more violation of Title 18, United States Code §§1591(a) and 2 (sex trafficking by force, fraud or coercion, and aiding and abetting in the commission of the offense), and §1952 (use of interstate facilities to promote, manage or facilitate prostitution). Accordingly, I respectfully request the issuance of a warrant to search the following digital media for the items on attached list A.

DAVID RAPP
Special Agent
Federal Bureau of Investigation

SUBSCRIBED and SWORN to before me this ___25___ day of September 2019.

PATRICIA L. COHEN
United States Magistrate Judge
Eastern District of Missouri

13

**ATTACHMENT A**
**ITEM TO BE SEARCHED**

A black Samsung cellular telephone seized from AK, which is currently stored in evidence. This item is being securely stored at the Federal Bureau of Investigation, St. Louis Division, within the Evidence Control Room marked as Item "1B1" and attached with barcode labeled E6384804, 2222 Market Street, St. Louis, MO 63103.

## ATTACHMENT B
## LIST OF ITEMS TO BE SEIZED AND SEARCHED

1.  Cellular telephone(s), cellular telephone hardware, cellular telephone software, cellular telephone related documentation, cellular telephone media, cellular telephone passwords and data security devices, within:

A black Samsung cellular telephone, marked as Item "1B1" and attached with barcode labeled E6384804, which is currently stored in evidence at the Federal Bureau of Investigation, St. Louis Division, 2222 Market Street, St. Louis, MO, 63103.

2.  All data files, including but not limited to graphic representations, containing matter pertaining to human-trafficking/prostitution, that is, visual depictions of females and males posed in sexually-explicit positions or engaging in sexually-explicit conduct; that is, visual depictions of U. S. currency, firearms and people posed with such items.

3.  Graphic interchange formats and/or photographs, and other visual depictions of such Graphic Interchange formats (including, but not limited to, JPG, GIF, TIF, AVI and MPEG) containing matter pertaining to human-trafficking/prostitution.

4.  Any visual depiction, in any form, containing matter pertaining to human-trafficking/prostitution, which is a visual depiction of females and males posed in sexually explicit positions or engaging in sexually explicit conduct.

5.  Electronic mail, chat logs, and electronic messages, offering to transmit through interstate or foreign commerce, including by United States mail or by computer, visual depictions of females and males posed in sexually explicit positions or engaging in sexually explicit conduct.

6.  All correspondence regarding the possession, distribution, sale or receipt of human-trafficking/prostitution.

7.  Any correspondence pertaining to the persuasion, inducement, and/or enticement of females and males posed in sexually explicit positions or engaging in sexually explicit conduct.

8.  Any and all correspondence offering to transmit through interstate commerce including by computer/email/internet/social media, any information related to human-trafficking and prostitution or any visual depictions of females and males posed in sexually explicit positions or engaging in sexually explicit conduct.

9.  Any and all correspondence identifying persons transmitting, through interstate commerce including by computer/email/internet/social media, any information related to human-

trafficking and prostitution or any visual depictions of females and males posed in sexually explicit positions or engaging in sexually explicit conduct.

10. Any and all records and ledgers bearing on the production, reproduction, receipt, shipment, orders, requests, trades, purchases, or transactions of any kind involving the transmission, through interstate commerce including by United States Mails or by computer, any information related to human-trafficking and prostitution or any visual depictions of females and males posed in sexually explicit positions or engaging in sexually explicit conduct.

11. Any and all address books, mailing lists, supplier lists, mailing address labels, and any and all documents and records pertaining to the preparation, purchase, and acquisition of names or lists of names to be used in connection with the purchase, sale, trade, or transmission, through interstate commerce computer/email/internet/social media, or any information related to human-trafficking and prostitution or any visual depictions of females and males posed in sexually explicit positions or engaging in sexually explicit conduct.

12. Copies of all the above in whatever form including digital format.

3